NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1640
_____

JOSEPH J. GERMINARO;
GABRIELLA P. GERMINARO,
                                        Appellants

v.

FIDELITY NATIONAL TITLE INSURANCE COMPANY;
COMMONWEALTH LAND TITLE INSURANCE COMPANY
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-14-cv-01202)
District Judge:  Hon. Nora B. Fischer
_____

ARGUED
April 30, 2018

Before:   JORDAN, ROTH, *Circuit Judges* and MARIANI[*], *District Judge.*

(Opinion Filed: June 14, 2018)
_____

---

[*] Honorable Robert D. Mariani, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

Michael P. Denver   [ARGUED]
Hollister & Brace
1126 Santa Barbara Street
Santa Barbara, CA   93101
        *Counsel for Appellants*

Erica L. Calderas   [ARGUED]
Dennis R. Rose
Hahn Loeser & Parks
200 Public Square
3300 BP America Building
Suite 2800
Cleveland, OH   44114
        *Counsel for Appellees*

_____

OPINION[**]
_____

JORDAN, *Circuit Judge*.

Joseph and Gabriella Germinaro appeal from the grant of summary judgment against them on their claim that Fidelity National Title Insurance Company ("FNTIC") and Commonwealth Land Title Insurance Company ("CLTIC") violated the Racketeer Influenced and Corrupt Organizations Act ("RICO").  We will affirm.

## I.    FACTS[1]

LandAmerica 1031 Exchange Services, Inc. ("LES") assisted customers who desired to gain tax advantages by exchanging one piece of real property for another pursuant to 26 U.S.C. § 1031.  By acting as a qualified intermediary under the Internal Revenue Code, LES facilitated such exchanges.[2]  LES was a subsidiary of LandAmerica

---

[**] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

2

Financial Group, Inc. ("LFG") and had two relevant sister companies, Lawyers Title Insurance Corporation ("LTIC") and CLTIC, both of which were also LFG subsidiaries.

LES entered into thousands of land exchange agreements with customers. Although the parties dispute whether LES had a single "form agreement," most of the agreements contained common language. (J.A. at 9.) The terms of those agreements stated that LES would acquire the relinquished property from the customer and convey back to that customer the replacement property. LES "agree[d] to hold and apply" the proceeds from the sale of the relinquished property "in accordance with the terms and conditions of [the] [e]xchange [a]greement." (J.A. at 920.) That included "mak[ing] payments from the [e]xchange [f]unds to acquire the [r]eplacement [p]roperty" on behalf

---

[1] The facts set forth here are in the light most favorable to the Germinaros. *See infra* note 6.

[2] Under § 1031(a) of the Internal Revenue Code, the sellers of a property can defer their capital gains on the taxable proceeds of the sale if those funds are subsequently used to purchase a property of like kind. 26 U.S.C. § 1031(a)(1). Property owners can only take advantage of the Code's tax-deferral benefit if they do not actually or constructively receive the proceeds of the sale of the relinquished property. 26 C.F.R. § 1.1031(k)-1(f). One "safe harbor" for a property owner who wants to ensure compliance with that requirement is to use a "qualified intermediary" to conduct the exchange. *Id.* § 1.1031(k)-1(g)(4). A qualified intermediary is defined as "a person who … [e]nters into a written agreement with the taxpayer (the 'exchange agreement') and, as required by the exchange agreement, acquires the relinquished property from the taxpayer, transfers the relinquished property, acquires the replacement property, and transfers the replacement property to the taxpayer." *Id.* § 1.1031(k)-1(g)(4)(iii)(B). That safe harbor is only triggered "if the agreement between the taxpayer and the qualified intermediary expressly limits the taxpayer's rights to receive, pledge, borrow, or otherwise obtain the benefits of money or other property held by the qualified intermediary[.]" *Id.* § 1.1031(k)-1(g)(ii).
Although Congress amended § 1031(a) in December 2017, Pub. L. No. 115-97, § 13303, 131 Stat. 2054, 2123 (2017), the parties have not given any reason to believe that those amendments alter the disposition of this case.

3

of the customer. (J.A. at 920.) The agreements expressly stated that "LES shall have sole and exclusive possession, dominion, control and use of all [e]xchange [f]unds, including interest, if any, earned on the [e]xchange [f]unds[.]" (J.A. at 921.) Furthermore, the customer was given "no right, title, or interest in or to the [e]xchange [f]unds or any earnings thereon" and "no right, power, or option to demand, call for, receive, pledge, borrow or otherwise obtain the benefits of any of [the] [e]xchange [f]unds" before the exchange was completed. (J.A. at 921.)

LES agreed to "deposit the [e]xchange [f]unds in an account maintained at SunTrust Bank" and guaranteed customers they would "receive interest" on those funds at a specified rate. (J.A. at 921.) That interest would be applied to the cost of the replacement property or paid to the customer after the exchange was completed. "LES unconditionally guarantee[d] the return and availability of the [e]xchange [f]unds and the guaranteed interest" stated in the agreement. (J.A. at 922.) Customers "acknowledge[d] and agree[d] that the amount of the [e]xchange [f]unds may be in excess of the maximum amount of deposit insurance carried by the depository institution[.]" (J.A. at 921.)

LES's exchange agreements further set out LES's contractual duties in Paragraph 6. That part of the agreement said "LES has entered into [the] [e]xchange [a]greement with the intention of being a 'qualified intermediary' within the meaning of Section 1.1031(k)-1(g)(4)(iii) [of Title 26 of the Code of Federal Regulations] … and shall use its best efforts to retain that status until all of the [e]xchange [f]unds have been disbursed in accordance with" the agreement. (J.A. at 924.) LES expressly stated that it was "entering into [t]he exchange agreement solely for the purpose of facilitating [the

4

customer's] exchange of the relinquished property for the replacement property." (J.A. at 924 (emphasis omitted).)

Joseph and Gabriella Germinaro entered into an exchange agreement with LES dated October 22, 2008. The Germinaros wanted to exchange an investment property located in Pittsburgh worth about $831,187 for another property located in the area. They chose LES because they had conducted a successful § 1031 exchange with LES's predecessor company in 2002-03. Their exchange agreement was nearly identical to the form exchange agreements described above, except that their agreement stated:

> [The Germinaros] will receive interest on the [e]xchange [f]unds at an annualized rate equal to 100% of the intended Federal Funds Rate as announced by the Federal Open Market Committee less seventy five basis points (-75 bps), compounded daily, adjusting as the Federal Funds Rate does, one day following the same, during the Exchange Period (the "Growth Factor") from the first business day following LES'[s] receipt of funds via wire transfer to the LES account in Richmond, Virginia that it maintains at SunTrust Bank for the purpose of collecting taxpayers' exchange funds … to the day of withdrawal. LES and [the Germinaros] agree that the Growth Factor, if not applied to the acquisition of the Replacement Property identified by [the Germinaros] … shall be paid to [the Germinaros] after the Termination Date. LES unconditionally guarantees the return and availability of the [e]xchange [f]unds and the guaranteed interest rate stated above.

(J.A. at 1170.)

The general practice at LES was to hold all exchange funds in a single, commingled account at SunTrust Bank (the "3318 Account"). Customers could specifically request that LES place their funds in a segregated account, but that was not the default process. The exchange funds in the 3318 Account were the main source for financing LES's daily operations, such as paying operating expenses, paying dividends to

5

LFG, obtaining replacement properties, or returning funds to customers whose § 1031 exchanges could not be completed. Additionally, the exchange funds were invested at LFG's discretion. The Germinaros thought LES was going to place their exchange funds into a segregated account with its own account number, based on earlier conversations that Mr. Germinaro had with an LTIC attorney and an LES agent. But LES appears to have had a different understanding because a segregated account was not mentioned in the exchange agreement and the funds were placed in the 3318 Account.

Unfortunately, the Germinaros entered the exchange agreement with LES at an inopportune time. A liquidity problem that had been plaguing LES for several months, as a result of having a large portion of its investment portfolio it could not sell during the 2008 financial crisis, finally drove operations to a halt just one week after LES closed on the sale of the Germinaros' relinquished property.

The liquidity problem had its roots in a specific investment strategy. Beginning in 2002, LFG, which performed the treasury functions for LES, routinely invested the exchange funds from the 3318 Account in Auction Rate Securities ("ARSs"). ARSs are "debt instrument[s] with a long-term maturity for which the interest rate is regularly set through an auction process that is typically held every 7, 14, 28[,] or 35 days." (J.A. at 13 n.6.) Although all securities involve some level of risk that prevent a return from being a "guarantee," (J.A. at 5252-53), ARSs were generally thought of as "a high grade, relatively low risk investment," (J.A. at 40). The ARSs that LES purchased consisted "entirely of debt instruments backed by student loans, substantially all of which [were] guaranteed by the United States government." (J.A. at 370.)

6

But in February 2008, the ARS market suddenly froze and LES's investments became illiquid. LES concluded that it had "liquidity exposure to [those] securities to the extent that it would be required to utilize [those] securities to satisfy the purchase of properties." (J.A. at 371.) Thus, it began using new, incoming exchange funds to satisfy older, existing exchange obligations.

Overtime, that approach proved untenable. LES ultimately ceased operations, and both LFG and LES "filed voluntary petitions for [Chapter 11] bankruptcy on November 26, 2008." (J.A. at 5276.) One week after the Germinaros' property was sold, they received notice that LES was "accepting no new customers and … terminating its operations." (J.A. at 5291.)

When LFG and LES filed for bankruptcy, FNTIC agreed to acquire all of LTIC's stock and Chicago Title Insurance Company agreed to acquire all of CLTIC's stock. LTIC, CLTIC, and the Germinaros all participated in the bankruptcy proceedings. The bankruptcy court issued two pertinent decisions as part of adversary proceedings initiated by LES exchange customers. In its first ruling, the court held that exchange funds deposited into segregated accounts were property of the bankruptcy estate rather than LES's customers. *Millard Refrigerated Servs., Inc. v. LandAmerica 1031 Exch. Servs., Inc. (In re LandAmerica Fin. Grp., Inc.)*, 412 B.R. 800, 816-17 (Bankr. E.D. Va. 2009). In its second ruling, the court held the same for exchange funds deposited into the commingled 3318 Account. *Frontier Pepper's Ferry, LLC v. LandAmerica 1031 Exch. Servs., Inc. (In re LandAmerica Fin. Grp., Inc.)*, Bankr. No. 08-35994, Adversary Nos. 08-03148, 08-03171, 09-03023, 2009 WL 1269578, at *1, *4, *15 (Bankr. E.D. Va. May

7

7, 2009).  According to the court, those rulings were derived from the "plain, unambiguous language of the [e]xchange [a]greements," and thus "[t]he objective language of the [e]xchange [a]greements precludes consideration of any subjective belief that the parties may have had regarding the relationship between them."  *Id.* at *10, *15; *Millard*, 412 B.R. at 813, 817.

"The adversary cases 'were ultimately resolved through mediation; and the mediated settlement agreement ultimately served as the framework for the formulation of a consensual Chapter 11 plan.'"  (J.A. at 5279 (citation omitted).)  The bankruptcy court then entered an order on November 23, 2009, confirming the joint Chapter 11 plan of the initial debtors, as well as certain LFG affiliates.  To date, it appears that the Germinaros have received $614,145.67 on their claims.[3]

## II.    PROCEDURAL HISTORY

The Germinaros filed a complaint against FNTIC and CLTIC in a California state court on February 6, 2014.  The case was removed to federal court and was then transferred to the United States District Court for the Western District of Pennsylvania.

---

[3]  That amount includes funds received through the bankruptcy proceedings, as well as through the assignment of their interest in certain claims.  FNTIC and CLTIC, however, state that the Germinaros "or their assignee to date have received $950,969.84 on [the Germinaros'] claims."  (J.A. at 5291.)  Their number deviates from the amount the Germinaros say they received because FNTIC and CLTIC attribute to the Germinaros the distributions made to third parties to whom the Germinaros assigned their interests in various claims.

The Second Amended Complaint ("SAC") asserted eleven causes of action, including RICO violations.[4]

The SAC focuses on illegal and fraudulent conduct from February 2008 to November 2008. That specific timeframe is referenced in whole or part in Paragraphs 2, 7, 9, 20-24, 32, 64, 70, 74, and 77-98. Nevertheless, there are some facts about LES's general use of exchange funds without reference to any specific time period. Those facts provide background information about activities pre-dating the ARS market freeze in February 2008 and are useful for understanding the alleged Ponzi scheme undertaken in 2008.[5] The third cause of action listed in the SAC, which alleges RICO violations under 18 U.S.C. § 1962(c) and 1962(d), incorporated by reference all of those previous allegations. That claim alleges a "scheme and conspiracy … to run a 1031 Ponzi scheme at LES long enough for the ARS [f]reeze to thaw[.]" (J.A. at 90.) It states that "LES committed hundreds, if not thousands, of predicate acts" and was "knowingly aided and abetted" by CLTIC and LTIC "between February 11, 2008 and at least November 26, 2008[.]" (J.A. at 91.)

---

[4] The other claims alleged fraud, aiding and abetting fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, conversion, aiding and abetting conversion, intentional interference with a contract, breach of the implied covenant of good faith and fair dealing, breach of contract, and negligence. The District Court dismissed those claims at the pleadings stage as untimely. Those claims are not at issue in this appeal.

[5] "A Ponzi scheme uses the principal investments of newer investors, who are promised large returns, to pay older investors what appear to be higher returns, but which are in reality a return of their own principal or that of other investors." *Wiand v. Lee*, 753 F.3d 1194, 1201 (11th Cir. 2014).

FNTIC and CLTIC moved for judgment on the pleadings, which the District Court denied with respect to the RICO claims. At that time, the District Court was satisfied that enough facts were adequately pled in the SAC to allow the case to proceed to discovery on those claims.

The parties then filed cross-motions for summary judgment on the RICO claims. The Germinaros sought partial summary judgment as to liability only, while FNTIC and CLTIC requested summary judgment as to all aspects of the claims. The Germinaros argued that LTIC, CLTIC, and LES, together with their parent company, LFG, and various corporate officers, conspired to operate and did operate a "Ponzi scheme" when they induced customers to entrust their money with LES while misrepresenting and fraudulently concealing that LES was on the brink of insolvency. (J.A. at 6.) The Germinaros argued it was fraudulent to use their exchange funds to complete the exchanges of pre-existing customers. FNTIC and CLTIC countered that LFG and LES were legitimate companies that made informed business judgments while trying to weather the collapse of the real estate market in 2008, and, unfortunately for the Germinaros, their land exchange could not be completed when LFG's and LES's attempts to stay afloat failed. The District Court heard oral argument and granted FNTIC's and CLTIC's motion for summary judgment.

The Court concluded that the RICO claims failed as matter of law because the Germinaros alleged a pattern of racketeering lasting only for nine-and-a-half months, which was insufficient to establish the "continuity" requirement of a RICO violation. That requirement, according to the law of this Circuit, as more fully discussed herein,

10

demands more than twelve months of illegal conduct. The District Court said that even if

the Germinaros' SAC could be read to also allege six years of illicit conduct pre-dating

the ARS market freeze, the continuity requirement would still not be satisfied, in light of

the fact that the exchange agreement gave LES "sole and exclusive possession, dominion,

control and use" of the exchange funds, leaving the Germinaros with no legal or equitable

rights in those funds (J.A. at 29 (citation omitted)).

Because continuity could not be established, the Germinaros' RICO claims failed

as a matter of law, and the District Court granted summary judgment in favor of FNTIC

and CLTIC. The Germinaros timely appealed.

## III. DISCUSSION[6]

We agree with the District Court's conclusion that the Germinaros' RICO claims

under § 1962(c) and § 1962(d) fail because their allegations of a closed-ended Ponzi

scheme do not cover a substantial enough period of time to establish continuity. To

establish a RICO claim under § 1962(c), a plaintiff must demonstrate a pattern of

racketeering activity. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir.

2010). Proving a pattern of racketeering activity requires plaintiffs to show "that the

racketeering predicates are related, *and* that they amount to or pose a threat of continued

---

[6] The District Court had federal subject matter jurisdiction under 28 U.S.C.
§ 1331 and diversity jurisdiction under 28 U.S.C. § 1332. We have jurisdiction pursuant
to 28 U.S.C. § 1291. Our review of a grant of summary judgment is plenary. *Nationwide
Mut. Ins. v. CPB Int'l, Inc.*, 562 F.3d 591, 595 (3d Cir. 2009). Summary judgment is
appropriate when there are no genuine disputes of material fact and the moving party is
entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 250 (1986). In reviewing a summary judgment ruling, we consider
the facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 248-
49.

11

criminal activity." *United States v. Bergrin*, 650 F.3d 257, 267 (3d Cir. 2011) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).  Predicate acts are related if evidence demonstrates "that the criminal activities 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Id.* (quoting *H.J. Inc.*, 492 U.S. at 240).

The requirement that the predicate acts "amount to or pose a threat of continued criminal activity" is commonly known as the "continuity" requirement.  *Id.*  Continuity comes in two forms: closed-ended and open-ended.  *Id.*  Closed-ended continuity refers "to a closed period of repeated conduct," and it "can be established by 'proving a series of related predicates extending over a substantial period of time.'"  *Id.* (quoting *H.J., Inc.*, 492 U.S. at 241-42).  Open-ended continuity, on the other hand, refers "to past conduct that by its nature projects into the future with a threat of repetition," *id.*, and it can "be established by proving a threat of continuity, which exists where the predicate acts themselves involve threats of long-term racketeering activity, or where the predicate acts are part of an entity's regular way of doing business." *United States v. Pelullo*, 964 F.2d 193, 208 (3d Cir. 1992).

The Germinaros have not satisfied the continuity requirement.  First, their SAC alleges a closed-ended rather than an open-ended RICO scheme.  Second, the alleged nine-and-a-half-month period of alleged racketeering activity is insufficient as a matter of law to establish closed-ended continuity because activity covering less than twelve months does not constitute a substantial period of time.  Finally, even if the SAC were

12

read more broadly to have alleged years of deception leading up to the alleged 2008 Ponzi scheme, there is no evidence suggesting that the pre-2008 behavior constituted predicate acts under RICO. Therefore, the District Court rightly held that the Germinaros' RICO claims fail as a matter of law.

## A. The SAC Alleges a Closed-Ended RICO Scheme.

The District Court concluded that "the alleged racketeering activity [in this case] is properly characterized as a closed-ended scheme." (J.A. at 25.) We agree. The SAC focuses overwhelmingly on an alleged Ponzi scheme that occurred over a precisely defined period of time from February 11, 2008, to November 26, 2008, which corresponds roughly with the ARS market freeze.[7] Criminal activity occurring within a stated time period with specified start and end dates is the very definition of a closed-ended scheme. *See, e.g.*, *Bergrin*, 650 F.3d at 270 (concluding that an indictment alleged closed-ended continuity because it included "predicate offenses … alleged to have occurred over a 'closed period of repeated conduct,' *i.e.*, six years during which six criminal schemes were executed"). Thus, the RICO claims here are properly characterized as involving closed-ended continuity.[8]

---

[7] Even though we are at the summary judgment stage, the complaint remains an operative document because plaintiffs cannot make arguments or claims that exceed the boundaries of the allegations in their pleadings. *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (treating the allegations in a complaint as judicial admissions that bind the plaintiff throughout the course of a proceeding).

[8] While the SAC does state that "the pattern of racketeering continued and other efforts were undertaken [after November 26, 2008] in order to ensure that the misconduct of the enterprise was concealed[,]" (J.A. at 91), that does not transform the nature of the alleged Ponzi scheme from one of closed-ended continuity to one of open-ended

13

## B.    The Alleged Nine-and-a-Half-Month Ponzi Scheme

The District Court correctly concluded that the nine-and-a-half-month Ponzi

scheme that the Germinaros alleged in their SAC is not substantial enough to establish

closed-ended continuity.  To establish closed-ended continuity, the series of related

predicates must extend "over a substantial period of time."  *H.J. Inc.*, 492 U.S. at 242.

"Predicate acts extending over a few weeks or months and threatening no future criminal

conduct do not satisfy this requirement[.]"  *Id.*  That is because "Congress was concerned

in RICO with long-term criminal activity."  *Id.*  At bottom, continuity is "centrally a

temporal concept[,]" which is why we have stated that "duration is the *sine qua non* of

continuity."  *Hindes v. Castle*, 937 F.2d 868, 873 & n.4 (3d Cir. 1991).

Our case law clearly establishes that predicate acts spanning less than twelve

months fail as a matter of law to establish closed-ended continuity.  *See, e.g.*, *Tabas v.

Tabas*, 47 F.3d 1280, 1293 (3d Cir. 1995) ("[T]his court has faced the question of

continued racketeering activity in several cases, each time finding that conduct lasting no

more than twelve months did not meet the standard for closed-ended continuity.");

*Pelullo*, 964 F.2d at 209 ("While declining to define with precision the meaning of a

---

continuity.  Alleged efforts to conceal an alleged scheme do not alter the timeframe of
that scheme.  *See Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1024 (7th Cir. 1992)
(stating that acts undertaken to conceal previous criminal activity "do nothing to extend
the *duration* of the underlying … scheme" because "[a] conspiracy ends when the design
to commit substantive misconduct ends" and it cannot be extended "beyond that point
'merely because the conspirators take steps to bury their traces, in order to avoid
detection and punishment after the central criminal purpose has been accomplished'"
(quoting *Grunewald v. United States*, 353 U.S. 391, 405 (1957))); *Aldridge v. Lily-Tulip,
Inc. Salary Ret. Plan Benefits Comm.*, 953 F.2d 587, 594 (11th Cir. 1992) (concluding
that acts undertaken to conceal wrongdoing do not create open-ended continuity because
they do not "threaten future harm or a repetition of [the] illegal acts").

'substantial period of time,' we have never found such a period to exist where the racketeering activity occurred over a period of one year or less."); *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991) ("We hold that twelve months is not a substantial period of time.").

The alleged predicate acts supporting a Ponzi scheme during the ARS market freeze are thus insufficient as a matter of law to establish closed-ended continuity. The SAC alleges a "scheme and conspiracy … to run a 1031 Ponzi scheme at LES long enough for the ARS [f]reeze to thaw or for the enterprise to obtain capital from other sources to recharge the trust." (J.A. at 90.) That corresponds to the predicate acts the Germinaros allege occurred during the nine-and-a-half-month period "between February 11, 2008 and at least November 26, 2008[.]" (J.A. at 91.) That specific nine-and-a-half-month time period is repeated consistently throughout the SAC. Furthermore, the Germinaros admit in their appellate brief that "[t]he vast majority of the allegations [in the SAC] do address the 9 ½ month Ponzi scheme[.]" (Opening Br. at 14.) And the parties do not dispute that LES had stopped all of its operations and filed for bankruptcy by November 26, 2008. Thus, the pattern of racketeering activity alleged in the SAC is less than twelve months and fails as a matter of law to demonstrate closed-ended continuity.[9]

### C. The Alleged Illegal Activity Pre-Dating the Alleged Ponzi Scheme

---

[9] The Germinaros urge us to revisit our rule that twelve months is too short a period of time to establish closed-ended continuity. As a panel, we are not free to do that, but, even if we were, we would not be inclined to do so because our existing rule is entirely consistent with the Supreme Court's decision in *H.J. Inc.*

15

To get around the obstacle of having only pled a nine-and-a-half-month pattern of racketeering activity, the Germinaros now seek to extend the timeframe of the alleged predicate acts. They argue that the District Court "disregard[ed] allegations of [a] multi-year conspiracy supported by undisputed evidence."[10] (Opening Br. at 14.) They contend that "[w]hile the allegations do focus on the Ponzi scheme, there are also allegations specifically encompassing the [six] years of pre-Ponzi scheme misconduct, wherein [exchange funds were] misappropriated and lost." (Opening Br. at 14-15.) To the Germinaros, "each wire transfer of funds [from the exchange funds account to investments in ARSs] constituted a 'predicate act' of wire fraud that furthered the enterprise members' 'scheme to misuse [e]xchange [f]unds to create improper profits.'" (J.A. at 27 (citation omitted).)

Even if we broadly construe the Germinaros' SAC as alleging a scheme stretching back six years before the supposedly illegal acts in the nine-and-a-half-month Ponzi scheme – which we do not think is a sound reading of the complaint – the pleading still fails because the pre-2008 conduct does not constitute predicate acts. The District Court correctly determined that there was nothing illegal or unlawful about LES's and LFG's

---

[10] The Germinaros also state that "[t]he allegations concerning the 6 years of pre-Ponzi scheme misconduct were overlooked by the trial court, which instead focused solely on the allegations regarding the 9 ½ month Ponzi scheme." (Opening Br. at 19.) That assertion is not supported by the record. The District Court wrote a thorough and detailed opinion that dealt at length with the pre-Ponzi scheme misconduct the Germinaros now allege is a part of their claimed RICO scheme. (*See* J.A. at 27-42 (stating, in a discussion spanning sixteen pages under the heading "Conduct Predating the Alleged Ponzi Scheme," that "even if the [Germinaros'] argument is taken at face value, it fails on the merits because the record does not evidence a pattern of racketeering during the six-year period that predated the freezing of the ARS market").)

16

pre-2008 investment activity. To demonstrate predicate acts of wire fraud, a plaintiff must prove "(1) a scheme or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of … wire transmissions in furtherance of the scheme." *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012). We have said that "the words 'to defraud' commonly refer 'to wrongdoing one in his property rights by dishonest methods or schemes,' and usually signify the deprivation of something of value by trick, deceit, chicane, or overreaching." *United States v. Hedaithy*, 392 F.3d 580, 591 (3d Cir. 2004) (citation omitted). The Germinaros cannot satisfy the elements required to prove that LES's pre-2008 investment of exchange funds in ARSs constituted wire fraud.

Those investments could not constitute a scheme to defraud because the terms of the exchange agreements with LES's customers permitted such use of the money generated by property sales. The agreements stated that "LES shall have sole and exclusive possession, dominion, control and use of all [e]xchange [f]unds, including interest, if any, earned on the [e]xchange [f]unds[.]" (J.A. at 921.) Furthermore, the customer was given "no right, title, or interest in or to the [e]xchange [f]unds or any earnings thereon" and "no right, power, or option to demand, call for, receive, pledge, borrow or otherwise obtain the benefits of any of [the] [e]xchange [f]unds" before the exchange is completed. (J.A. at 921.) Although "LES agree[d] to hold and apply" the proceeds from the sale of the relinquished property, it agreed to do so only "in accordance with the terms and conditions of [the] [e]xchange [a]greement." (J.A. at 920.) Thus, as soon as the money was deposited in the exchange account at SunTrust

17

Bank, LES was permitted under the mutually agreed upon terms of its exchange agreements to do as it pleased with the funds. The bankruptcy court reached the same conclusion, understanding that investing those funds in ARSs was a right and power LES had under the terms of the exchange agreements. *See Frontier*, 2009 WL 1269578, at *11 ("LES … was free to use the funds to operate its business activities without any limitations whatsoever."); *Millard*, 412 B.R. at 811 n.19 ("Nothing in the [e]xchange [a]greements … prohibited LES from investing the [e]xchange [f]unds …, from transferring [them] out of [their SunTrust account] … for its own use, or from otherwise obtaining the benefits of the [e]xchange [f]unds.").

The Germinaros argue five ways for a different conclusion, but without persuasive force. First, they argue that "the agreement conveys 'exclusive control,' not because the exchangers did not care what was done with their money, but because it was required by the tax code to effectuate the exchange." (Opening Br. at 26.) Indeed. Tax regulations require qualified intermediaries to "control" the exchange funds. *See* 26 C.F.R. § 1.1031(k)-1(f). But that does not mean LES's position suddenly became one of trust.[11] Quite the opposite. LES's control was unfettered exactly because the Code intended it to be, and that is the condition upon which the Germinaros and others had to act if they wanted the tax advantages available through the use of a qualified intermediary. The Germinaros could have opted for a different type of exchange arrangement protected

_____

[11] In fact, that issue was decided by the bankruptcy court. *See Frontier*, 2009 WL 1269578, at *12 ("[T]he intention of the parties not to create an express trust can be gleaned from their decision to use the qualified intermediary option from among the four safe harbor options available within the Treasury Regulations.").

18

under the federal regulations, such as a "qualified escrow account" or a "qualified trust." *See* 26 C.F.R. § 1.1031(k)-1(g)(3). They chose not to. That the deal went badly does not mean that the Germinaros' arrangement with LES can be transformed from one involving a qualified intermediary into one involving a different safe harbor under the federal regulations.

Second, the Germinaros argue that they and several other exchangers thought that their agreements with LES required exchange funds to remain in a bank account at SunTrust without being removed for investment. But a contracting party's unilateral, subjective beliefs cannot overcome a contract's unambiguous language. (*See* J.A. at 927 (stating that the exchange agreements are governed by Virginia law)); *see also Babcock & Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 249 (Va. 2016) ("When courts search for the parties' intent in an unambiguous contract provision, the search ends where it begins—with the plain, usual, and ordinary meaning of the words themselves."); *id.* at 249-50 ("It is the court's duty to declare what the instrument itself says it says. [W]hat the parties claim they might have said, or should have said, cannot alter what they actually said." (alteration in original) (citations and footnote omitted)).

Third, the Germinaros say that the District Court erred when it relied on the bankruptcy court's determination that the exchange agreements gave LES exclusive control over the exchange funds. The District Court, however, conducted its own analysis of the contractual language, and it used the bankruptcy court's opinion only to bolster its independent conclusion.

19

Fourth, the Germinaros argue that "[c]ommon sense dictates that[] no exchanger would ever confer 'exclusive control' over the exchanger's nest-egg to a stranger, if 'exclusive control' enabled the stranger to do whatever the stranger wanted with the money, including gambling it for the sole benefit of the stranger." (Opening Br. at 27.) The answer to that, again, is that people did relinquish control knowingly and willingly, because they wanted the tax advantages they could gain from doing so. They were promised that they would "receive interest" on their exchange funds at a specified rate. (J.A. at 921.) And "LES unconditionally guarantee[d] the return and availability of the [e]xchange [f]unds and the guaranteed interest stated" in the agreement. (J.A. at 922.) Thus, there was a guaranteed return to the Germinaros fixed in the exchange agreement, and any returns or losses on LES's investments were to be borne solely by LES. That the collapse of the ARS market in 2008 disrupted those expectations is surely unfortunate, but risk is inherent in any business venture. The Germinaros have pointed to nothing indicating that the risk LES's investments posed amounted to a fraud.

Finally, the Germinaros argue that one of LES's and LFG's own lawyers had concluded that the exchange agreements did not allow LES to invest exchange funds.[12]

---

[12] The lawyer wrote in an email:

I looked at [the exchange agreements], and don't see any basis to give investors auction rate notes rather than cash. On the contrary, as you probably noted already, the implications (though admittedly not the express words) of the language in section 3(a) is that the funds will be deposited in a bank account at SunTrust and kept there, not in some other kind of non-bank investment "account" at SunTrust or Citi, otherwise, why would the section talk about deposit insurance limits? Also, and again as you

Yet even that lawyer admitted that the express language of the agreement did not prevent LES and LFG from investing the exchange funds. The only conclusion the lawyer reached was that LES probably could not give its customers ARSs instead of the cash value of their share of the exchange funds.

In sum, while we recognize that LES's and LFG's bankruptcies exposed the Germinaros to an unexpected financial problem, they cannot prove a substantive RICO violation because the continuity requirement cannot be satisfied.[13] Because the Germinaros' RICO claim under § 1962(c) fails, their RICO conspiracy claim under § 1962(d) also fails as a matter of law. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 372 ("[A] § 1962(d) claim must be dismissed if the complaint does not adequately allege 'an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] offense[.]'" (second alteration in original) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997))).

## IV. CONCLUSION

For the foregoing reasons, we will affirm the grant of summary judgment in favor of FNTIC and CLTIC.

---

doubtless saw, the unconditional guarantee of the "return and availability" of the [e]xchange [f]unds is quite bad for the client.

(J.A. at 3397 (emphasis omitted).)

[13] To the extent that the Germinaros also argue that the alleged predicate acts extend beyond the nine-and-a-half-month period covering the alleged Ponzi scheme because the SAC also alleges an attempt to conceal the scheme, such misconduct cannot augment the period of time covered by the alleged Ponzi scheme itself. *See supra* note 8.