PRESENT:  All the Justices

H. CLIFF PAGE

OPINION BY
v.  Record No. 230521        JUSTICE D. ARTHUR KELSEY
JULY 3, 2024
PORTSMOUTH REDEVELOPMENT AND
HOUSING AUTHORITY

FROM THE COURT OF APPEALS OF VIRGINIA

H. Cliff Page sued the Portsmouth Redevelopment and Housing Authority ("PRHA"),

claiming that it had negligently damaged a building that he owned.  The circuit court held that

sovereign immunity barred Page's claim against PRHA.  The Court of Appeals affirmed.  We

disagree and hold that sovereign immunity does not shield PRHA from tort liability under the

circumstances of this case.

I.

Page owns a building in Portsmouth that was adjacent to a building that had been owned

by PRHA.  The two buildings shared a common wall.  In 2014, PRHA demolished its building

after the City of Portsmouth declared it to be an unlawful nuisance.  Page claimed that the

demolition was negligently performed and damaged his building's "supporting structures,

interior wall surfaces, and roof, resulting in significant ongoing and increasing water damage to

interior floors, interior ceiling, and personal property within the building."  J.A. at 2.  PRHA

responded with a demurrer and a plea in bar.  The demurrer raised an argument that was later

withdrawn.  The plea in bar raised the defense of sovereign immunity.

The circuit court held an ore tenus hearing on the plea in bar.  At that hearing, PRHA

introduced a Community Development Block Grant Eligibility Certification Form ("CDBG

form") representing that in 2004 certain property in downtown Portsmouth had been designated

as a "slum and blight" area for purposes of seeking Community Development Block Grant

funding through the United States Department of Housing and Urban Development. *Id.* at 188. In 2009, PRHA had purchased one parcel and building (1020 High Street) within the designated area. The CDBG form certified that this "blight[ed]" building had "failing roof and framing materials, water damaged and deteriorated interior walls and ceilings, and the presence of asbestos containing materials." *Id.*

After its purchase by PRHA, the building housed "Oasis Ministries," which "operated as a soup kitchen." *Id.* at 33. Page testified that the operation also included a "clothing store" and "food pantry." *Id.* at 117. After five years, during which PRHA had made no efforts to make the building safe for use by the public, the City of Portsmouth in 2014 issued a "NOTICE OF EMERGENCY DEMOLITION" stating that the building had been "declared a dangerous building" pursuant to Part III of the Virginia Uniform Statewide Building Code and Section 17-1 of the Portsmouth City Code. *See id.* at 186. This declaration exposed PRHA to potential criminal prosecution and civil penalties if the Notice of Emergency Demolition was disobeyed. *See* Code § 36-106.

Describing "[s]tructures such as this one" as "attractive nuisances for illegal crime, vagrants and curious children," the City gave PRHA two weeks to "abate the hazards." J.A. at 187. If PRHA failed to do so, the City stated that it would conduct an "Emergency Demolition" of the building "using City funds" and later seek reimbursement from PRHA. *Id.* (emphasis omitted). In response, PRHA complied with the City's directive by hiring a private contractor to raze the building to the ground. Page alleged that in the process of doing so, his adjacent building was badly damaged.

In the circuit court, Page offered two separate (though sometimes commingled) reasons why sovereign immunity did not apply. The first was that PRHA intended all along to sell the property "akin to a private land developer," *id.* at 33, and manipulated the City to issue the

2

Notice of Emergency Demolition because PRHA "would not be eligible for the block grant funds if the property was not blighted," *see id.* at 100; *id.* at 12 n.1. The circuit court did not address this argument specifically but did point out that, at the time of its ruling, "[f]ive years ha[d] passed since the demolition and the property ha[d] not yet been sold." *Id.* at 33.

Page's second rationale asserted that, whatever PRHA's subjective motive, certain objective facts were legally dispositive. PRHA owned the building for more than five years and did nothing to address the "failing roof, water damage, and asbestos, all problems that a private landowner would be responsible for addressing," and allowed it to "become a hotbed for criminal activity." *Id.* at 13-14. "Because of PRHA's malfeasance," Page argued, the City declared the building to be an unlawful nuisance and ordered its renovation or demolition. *Id.* From Page's perspective, these facts describe an inept exercise of a proprietary function — not a governmental function. The same could be said, Page reasoned, of PRHA's negligent attempt to abate the unlawful nuisance in response to the Notice of Emergency Demolition. For all practical purposes, Page concluded, PRHA was acting no differently than a private landowner.

In response, PRHA advanced a simple thesis: PRHA's immunity should be exactly the same as that of the City of Portsmouth. Protecting the public from unlawful nuisances is a traditional police power of local government. It follows, PRHA argued, that because the City would have sovereign immunity if the City had demolished PRHA's building, so too should PRHA for obeying the City's Notice of Emergency Demolition.

The circuit court agreed with PRHA and dismissed Page's claim. In its letter opinion, the court made several factual findings. After PRHA purchased the building, the court found, it was used by "Oasis Ministries," which "operated as a soup kitchen." *Id.* at 33. Even so, the court added, "[b]y all accounts, the demolished structure was dilapidated and unfit for human habitation." *Id.* Equally significant, the court made a factual finding that "[t]he demolition of

3

the property was implemented under the *City of Portsmouth's* plan to address the blight in the Downtown Portsmouth Historic District." *Id.* (emphasis added). Nothing in the letter opinion implied a finding that PRHA would have demolished the building had it not been directed by the City to abate the unlawful "nuisance" within two weeks of the City's Notice of Emergency Demolition, *id.* at 187. Despite these factual findings, the court reasoned, PRHA was nonetheless legally protected by the umbrella effect of the City's sovereign immunity. "For the reasons set forth in [its] letter opinion," the court entered a final order that "grant[ed] Defendant's Plea in Bar and dismiss[ed] the case." *Id.* at 34.[1]

A panel of the Court of Appeals affirmed the circuit court's ruling. The panel's unpublished opinion rejected Page's core argument that "PRHA is not protected by sovereign immunity" because "[t]he City's interest in demolition [to protect public welfare] does not impute to PRHA." *Page v. Portsmouth Redev. & Hous. Auth.*, Record No. 0175-22-1, 2023 Va. App. LEXIS 407, at *16 n.7 (June 20, 2023) (citation omitted). The panel stated that it would not consider this argument because Page had conceded in the circuit court that PRHA was "acting . . . on behalf of the [C]ity." *Id.* at *16-17 n.7 (citation omitted). Having made that concession, the panel ruled, Page's argument on this issue was "barred by the approbate-reprobate doctrine" and "[a]ccordingly, [the panel] will not disturb the circuit court's finding that PRHA occupied the same status as the City for sovereign immunity purposes." *Id.*

---

[1] The circuit court denied Page's subsequent motion to reconsider. Page then filed a second motion to reconsider with attached exhibits. This second motion was denied by an opinion and order issued on the 22nd day after the entry of the final order. Implicitly applying Rule 1:1, the Court of Appeals held that the circuit court lacked authority to issue the opinion and order denying the second motion to reconsider. *Page v. Portsmouth Redev. & Hous. Auth.*, Record No. 0175-22-1, 2023 Va. App. LEXIS 407, at *8 (June 20, 2023) ("The circuit court's actions were taken after it had already lost jurisdiction of the matter . . . ."). Page does not address this issue on brief. Our opinion, therefore, does not rely upon the assertions in the second motion to reconsider, its attached exhibits, or the opinion and order denying the motion. *See generally Super Fresh Food Mkts. of Va. v. Ruffin*, 263 Va. 555, 560 (2002).

II.

On appeal to us, Page challenges the determination by the Court of Appeals that he had conceded in the circuit court that PRHA "w[as] acting . . . on behalf of the [C]ity" and thus had waived his argument that "[t]he City's interest in demolition [to protect public welfare] does not impute to PRHA." *Id.* Page then reaffirms that assertion as his core thesis:  The City — not PRHA — acted in its governmental capacity when it declared PRHA's building to be a public nuisance and issued its Notice of Emergency Demolition demanding that it be renovated or razed.  No governmental function, Page contends, gave PRHA the discretion to allow a building unfit for human occupancy to be open to the public or to disobey the City's Notice of Emergency Demolition declaring it to be an unlawful public nuisance.

A.

We first address whether the Court of Appeals erroneously truncated its analysis by holding that Page violated the approbate-reprobate doctrine.  We hold that it did.

This estoppel doctrine has been a "longstanding component of our jurisprudence" and applies whenever a litigant "has affirmatively staked out a position or asked the court to act." *Commonwealth v. Holman*, 303 Va. 62, 71-72 (2024).  It forbids litigants from "'playing fast and loose' with the courts or 'blowing hot and cold' depending on their perceived self-interests." *Babcock & Wilcox Co. v. Areva NP, Inc.*, 292 Va. 165, 204-05 (2016) (citations omitted).  The justification for this "ancient" doctrine is a "basic tenet of fair play:  No one should be permitted, in the language of the vernacular, to talk through both sides of his mouth." *Wooten v. Bank of Am., N.A.*, 290 Va. 306, 309-10 (2015).

Holding that Page violated these principles, the Court of Appeals precluded him from contesting that PRHA had the same level of sovereign-immunity protection afforded to the City. *Page*, 2023 Va. App. LEXIS 407, at *16 n.7.  Under settled law, the Court of Appeals

recognized, a municipality acts in its governmental, not proprietary, capacity when it demolishes an unsafe building owned by another who refuses to "abate the public nuisance." *Lee v. City of Norfolk*, 281 Va. 423, 440 (2011). Relying on Page's alleged concession, the Court of Appeals treated PRHA as an alter-ego of the City — thus viewing the circumstances of Page's case as "almost identical to those in *Lee*." *Page*, 2023 Va. App. LEXIS 407, at *15.

We are unaware of anywhere in the record, however, where Page either advocated this alter-ego theory or conceded it. To be sure, the circuit court never interpreted Page's position in this manner. Nor did PRHA claim that Page had violated the approbate-reprobate doctrine in either the Court of Appeals or the circuit court.[2] The Court of Appeals, however, stated that Page's counsel had "conceded" in the circuit court that PRHA was "acting . . . on behalf of the [C]ity." *Id.* at *16 n.7. This language was lifted from a remark that Page's counsel made in open court in response to a question from the bench:

> We are saying it was not an exigent situation but that they were acting *in their proprietary role* on behalf of the [C]ity. I think under certain circumstances in that regard they can make the teardown; however, they have to do so and they are not immune from prosecution because they are doing *a proprietary function*. But as to your direct question, no, I'm not saying they couldn't take it down. They just had to take it down and be responsible for how it was done.

J.A. at 80 (emphases added).

When quoting from this language, the Court of Appeals inserted an ellipsis that deleted an important qualifier in the sentence — "in their proprietary role," *id.* The Court of Appeals also failed to acknowledge the next sentence, which again asserted that PRHA was performing

---

[2] During oral argument before this Court, we asked PRHA's counsel about footnote 7 in the opinion of the Court of Appeals. With commendable candor, counsel replied: "I don't take the position that [Page] conceded that at the trial court level." Oral Argument Audio at 21:47 to 22:35.

"a proprietary function," *id.*, in its response to the City's Notice of Emergency Demolition. As we read counsel's statements, they merely tracked Page's principal argument that PRHA's negligence occurred while it was acting in its "proprietary role" performing a "proprietary function," *id.*, outside the protection of sovereign immunity. We thus see no reason to apply the approbate-reprobate doctrine to estop Page from arguing that sovereign-immunity principles treat the City (which directed PRHA to abate an unlawful nuisance) differently than PRHA (which maintained for five years an unabated and unlawful nuisance). The Court of Appeals erred in ruling otherwise.

## B.

We next address whether the Court of Appeals erroneously held that sovereign immunity protects PRHA from negligence liability incurred during the demolition of its "dangerous building," *id.* at 186, after receiving the City's Notice of Emergency Demolition. Given the unique facts of this case, we hold that sovereign immunity does not immunize PRHA from such liability.

### 1.

Under Virginia law, a municipal redevelopment and housing authority can be held liable in tort while engaging in "proprietary functions" but not "governmental functions." *VEPCO v. Hampton Redev. & Hous. Auth.*, 217 Va. 30, 34 (1976). The application of this seemingly simple principle, we confessed almost a century ago, "has occasioned much difficulty." *Ashbury v. Norfolk*, 152 Va. 278, 282 (1929); *see also Carter v. Chesterfield Cnty. Health Comm'n*, 259 Va. 588, 592 (2000). To this day, its simplicity is betrayed by a "troublesome" lack of predictability. Kent Sinclair & Charles E. Friend, Personal Injury Law in Virginia § 7.2[D][2], at 7-21 (4th ed. 2019). Though the "distinction might seem at first sight fanciful and shadowy," its effects on individual cases are "real and substantial." *Richmond v. Long's Adm'rs*, 58 Va. (17

7

Gratt.) 375, 379 (1867), *rev'd on other grounds*, *First Va. Bank-Colonial v. Baker*, 225 Va. 72, 78-79 (1983).

Governmental functions have a "political, discretionary and legislative" character, *id.* at 378-79, and typically involve exercises of "discretion" while performing "delegated or imposed" duties, *Carter*, 259 Va. at 592 (citation omitted). In contrast, proprietary functions generally involve nondiscretionary duties such as those imposed by the common law on private parties. Such functions include, for example, a municipality's duty to ensure "that its streets and sidewalks are in a safe condition, and that its sewers and drains are kept in good order, and that its other like municipal obligations are cared for." *Terry v. Richmond*, 94 Va. 537, 545-46 (1897).[3]

Seeking to characterize the demolition of its own building as a governmental function, PRHA frames its argument at a high level of generality. Demolishing a dangerously unsafe building, PRHA contends, falls within the core police powers of a municipality and thus qualifies as a governmental function. Because the municipality would be protected by sovereign immunity in the negligent performance of that function, the same must be true for a municipal housing authority. Viewing PRHA's demolition as a proprietary function, Page presents his argument at a high level of specificity. He focuses on the fact that PRHA maintained a dangerously unsafe building for five years. PRHA allowed the unhabitable building to be used

[3] *See also Robertson v. Western Va. Water Auth.*, 287 Va. 158, 161 (2014) (holding that the operation and maintenance of the sewer system is a proprietary function); *City of Va. Beach v. Flippen*, 251 Va. 358, 361-62 (1996) (holding that the city was acting in a proprietary function in its maintenance of sidewalks); *Woods v. Marion*, 245 Va. 44, 45-46 (1993) (holding that operating waterworks and performing routine street maintenance is a proprietary function); *Hampton Redev. & Hous. Auth.*, 217 Va. at 36 (holding that operation and maintenance of a housing project by a housing authority is a proprietary function); *City of Norfolk v. Hall*, 175 Va. 545, 551-52 (1940) (holding that the maintenance of city streets is a proprietary function); *Chalkley v. Richmond*, 88 Va. 402, 408 (1891) (holding that maintenance of the sewer is a proprietary function); Sinclair & Friend, *supra*, § 7.2 [D][2], at 7-21 to 7-25 (collecting cases).

by the public, refused to spend the money necessary to make it safe, and destroyed the building only after the City issued a Notice of Emergency Demolition. PRHA had no governmental discretion to maintain a public nuisance or to disobey the City's Notice of Emergency Demolition. In both respects, Page concludes, PRHA was acting in its proprietary capacity in the same manner as a private landowner would.

An analogous tension arose in *VEPCO v. Hampton Redevelopment & Housing Authority*, 217 Va. 30 (1976). In that case, an injured claimant alleged that Hampton Redevelopment and Housing Authority ("HRHA") maintained an unsafe "electric 'switching box'" at its housing complex. *Id.* at 31-32. Stated broadly, the question before the Court was whether the "operation and maintenance of a municipal housing project" was a proprietary or governmental function, with sovereign immunity protecting the latter but not the former. *Id.* at 34.

In his unanimous opinion for the Court, Justice Carrico began his analysis by agreeing with the trial judge's observation that HRHA's "operation of the project would 'obviously be, as a normal matter, a proprietary function.'" *Id.* He took issue, however, with the trial judge's view that HRHA's powers granted by statute "converted the [HRHA's] operation into a governmental function, rendering the [HRHA] immune from tort liability." *Id.* (citing former Code § 36-2(1)). The trial judge came to this conclusion based upon former Code § 36-2(1), which stated that municipal redevelopment and housing authorities have the power to perform

> the clearance, replanning and reconstruction of the areas in which insanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes for which public money may be spent and private property acquired and are *governmental functions of grave concern to the Commonwealth.*

*Hampton Redevelop. & Hous. Auth.*, 217 Va. at 34-35 (emphasis in original) (quoting former Code § 36-2(1) (1976)). Puzzled by this last phrase, the trial judge "remarked that the court

could not 'presume that the legislature of Virginia didn't know what governmental functions meant under the law in this Commonwealth.'" *Id.* at 35. Relying on this presumption, the trial judge held that the expressly stated general powers of municipal redevelopment and housing authorities had been statutorily deemed to be governmental functions — even though the "operation of the project would 'obviously be, as a normal matter, a proprietary function.'" *Id.* at 34.

Agreeing with the trial court's presumption but disagreeing with its conclusion, Justice Carrico explained that the statutory reference to "governmental functions" was best understood in its most generic sense as "merely intend[ing] to declare that the activities of housing authorities are proper functions of government, thereby emphasizing the public purposes of such authorities and reinforcing the justification for the expenditure of public funds for those purposes." *Id.* at 35 (citation omitted).[4] But when applying sovereign-immunity principles, he explained, courts must look behind such declarations "to ascertain the *true nature* of the functions." *Id.* (emphasis added).

Leaning heavily on this "true nature" maxim, *Hampton Redevelopment* held that when "operating and maintaining its housing project, the Authority assumes the role ordinarily occupied by a private landlord and performs functions which could as well be performed by private enterprise." *Id.* at 36 (citation omitted). "[U]nder any interpretation of the rules for determining whether a particular function is governmental or proprietary," *Hampton Redevelopment* concluded, "the operation and maintenance of a municipal housing project would be classified as proprietary." *Id.* HRHA thus could not claim the protection of sovereign

_____

[4] The General Assembly has amended Code § 36-2 once since *Hampton Redevelopment* was issued almost a half-century ago. *See* 2006 Acts ch. 784. This amendment does not introduce language that contradicts or undermines Justice Carrico's interpretation of the "governmental functions" clause.

10

immunity for its negligent "operation and maintenance" of a single electric switching box. *Id.*; *see also Carter*, 259 Va. at 592 (repeating *Hampton Redevelopment*'s holding that the negligent "operation and maintenance of [a] housing project" involves "a proprietary function of the housing authority").

Perhaps so, PRHA argues, but it did not *create* the unsafe conditions in its building because "[i]t was in need of demolition the moment PRHA purchased the Property in 2009." Appellee's Br. at 13. At that time, PRHA argues, the building was unfit for human occupancy "due to falling roof and framing materials, water damaged and deteriorated interior walls and ceiling, and the presence of asbestos containing materials." *Id.* We fail to see how this point helps PRHA's argument.

In *Hampton Redevelopment*, the unsafe electric switching box was "installed" by VEPCO. *See Hampton Redev. & Hous. Auth.*, 217 Va. at 31-32. Justice Carrico's reasoning did not turn upon who initially created the hazard but on who "operat[ed] and maintain[ed]" the property in that hazardous condition. *Id.* at 34. Taken at face value, moreover, PRHA's argument confirms that it operated and maintained a dangerously unsafe building for five years and for some portion of that time it "housed Oasis Ministries and operated as a soup kitchen" open to the public. J.A. at 33. If a single unsafe electric switching box (as in *Hampton Redevelopment*) implicates a proprietary duty to fix or replace the switching box, all the more does a dilapidated building (as in the present case) that is so unsafe for human occupancy that it should be leveled to the ground.

2.

We next address the view held by the Court of Appeals that the circumstances of this case are "almost identical," *Page*, 2023 Va. App. LEXIS 407, at *16, to those in *Lee v. City of*

11

*Norfolk*, 281 Va. 423 (2011). PRHA agrees with this view. Page does not. His case and *Lee*, Page argues, are superficially similar but substantively quite different. We agree.

In *Lee*, the City of Norfolk issued a declaration that a building owned by a private citizen was an unsafe, public nuisance and stated that the "City of Norfolk will be demolishing the structure under the emergency provisions of the Uniform Statewide Building Code." *Lee*, 281 Va. at 429 (citation omitted). When the property owner failed to abate the nuisance, the City of Norfolk — not the building owner — demolished the building. The City of Norfolk did so pursuant to its traditional "police power" to protect the public from the actions of a private citizen who had created a public nuisance. *Id.* at 439-40. Under settled law, a municipality acts in its governmental, not proprietary, capacity when it demolishes an unsafe building owned by another who refuses to "abate the public nuisance." *Id.* at 440.

PRHA agrees with our description of *Lee* but nonetheless argues that "[f]or purposes of uniformity in determining tort immunity, a municipal housing authority should be held to occupy the same status as the municipality which brings it into existence and oversees its activities." *Hampton Redev. & Hous. Auth.*, 217 Va. at 34. We wholly agree with this statement from *Hampton Redevelopment* — but disagree with PRHA's understanding of it.

The "initial inquiry" in *Hampton Redevelopment* was whether municipal housing and redevelopment authorities were "entitled to the same immunity from tort liability that is enjoyed by the Commonwealth." *Id.* at 32. If they were, we explained, it would be unnecessary to differentiate between governmental and proprietary functions. That distinction is inapplicable to tort actions "maintained against the Commonwealth." *See id.* Our answer to that initial inquiry was no — a municipal redevelopment and housing authority occupies the "same status" as a municipality for sovereign-immunity purposes. *Id.* at 34. In context, the "same status" observation meant only that the actions of municipalities and municipal housing authorities

12

(unlike those of the Commonwealth) must be evaluated under the governmental-versus-proprietary-function test. It did not mean that, as a categorical matter, a specific action by a municipality qualifying as a governmental function would necessarily (no matter the circumstances) be a governmental function if performed by a municipal housing authority. Being in the same status does not make municipalities and municipal housing authorities alter egos for purposes of sovereign immunity.

Maybe so, PRHA continues, but its enabling legislation expressly states that the "elimination of blight and redevelopment of blighted areas" are powers granted to PRHA that the General Assembly has deemed to be "governmental functions of grave concern to the Commonwealth." Code § 36-2(A)(2).[5] As discussed earlier, however, *Hampton Redevelopment* specifically addressed this point. Broad statutory statements of governmental purposes are relevant, but not dispositive, when examining the distinction between governmental and proprietary functions of municipal redevelopment and housing authorities. A more exacting standard requires us to examine the "true nature" of the authority's actions or inactions. *See Hampton Redev. & Hous. Auth.*, 217 Va. at 35.

In this case, we do not question PRHA's commitment to performing its statutory duties to eliminate blight. Whatever its subjective intentions, however, PRHA bought property that was unsafe for human occupancy, did nothing during the ensuing five years to make it safe, allowed the public to use the building, and demolished the building only after receiving a Notice of Emergency Demolition from the City of Portsmouth that, if disobeyed, would have exposed

---

[5] PRHA also relies on Code § 36-2(B), which states: "The necessity and the public purpose for the provisions hereinafter enacted are hereby declared as a matter of legislative determination." This provision, however, adds nothing to the sovereign-immunity analysis. It is a truism — all legislative acts are declarative of some form of "legislative determination" and necessarily rest upon a "public purpose," *id.*

PRHA to criminal prosecution and civil penalties. The City — not PRHA — was exercising a governmental function by directing PRHA to fix or demolish the building. Acting in its proprietary capacity, PRHA had to obey the City's Notice of Emergency Demolition no differently than any other private landowner that owned a dilapidated building constituting an unlawful public nuisance. Its obedience was not an exercise of governmental discretion — it was a ministerial legal duty to perform a proprietary function.

## III.

In sum, the Court of Appeals erred in applying the approbate-reprobate doctrine to limit Page's argument on appeal and in affirming the circuit court's holding that sovereign immunity barred Page's negligence claim against PRHA. We reverse and remand this case to the Court of Appeals with instructions to further remand the case to the circuit court for additional proceedings consistent with this opinion.

*Reversed and remanded.*